# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**COLLEEN M. MILLER**
    **Plaintiff,**

    v.                                                      Case No. 19-C-305

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Colleen Miller applied for social security disability benefits, claiming that she could no longer work due to a variety of impairments including multiple sclerosis ("MS"), fibromyalgia, and depression/anxiety, which caused debilitating fatigue, weakness, and cognitive limitations. The Administrative Law Judge ("ALJ") assigned to the case denied her claim, concluding that plaintiff remained capable of a range of sedentary work involving simple tasks.

Plaintiff now seeks judicial review of the denial. She raises a variety of challenges to the ALJ's decision, but I need address only two of her contentions, which require the matter be remanded.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application and Agency Determinations

Plaintiff applied for benefits in December 2012, alleging a disability onset date of July 31, 2010. (Tr. at 194.) The agency denied the application initially in May 2013 based on the review of Jerda Riley, M.D., and Erika Gilyot-Montgomery, Psy.D. (Tr. at 114.) Dr. Riley

concluded that plaintiff could perform sedentary work ("more than that would result in MS flares or fatigue") with occasional postural movements, frequent handling and fingering on the right, and avoiding exposure to extreme heat, vibration, and hazards. (Tr. at 106-09.) Dr. Gilyot-Montgomery found that plaintiff's mental impairments caused mild limitations in activities of daily living and social functioning, and moderate limitations in maintaining concentration, persistence, and pace. (Tr. at 104.) Dr. Gilyot-Montgomery specifically endorsed moderate limitations in remembering locations and work-like procedures; understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number of breaks; and responding appropriately to changes in the work setting. (Tr. at 110-11.) She concluded that plaintiff was capable of simple, one to three step tasks, given routine breaks and minimal work-related responsibilities. (Tr. at 111.)

Plaintiff requested reconsideration, but in November 2013 the agency denied that request based on the review of Susan Donahoo, Psy.D., and Janis Byrd, M.D. (Tr. at 115.) Dr. Donahoo found mild limitations in activities of daily living and social functioning, and moderate limitations in concentration, persistence, and pace. (Tr. at 123.) She specified moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number of rest periods; and

responding appropriately to changes in the work setting. (Tr. at 127-28.) Dr. Donahoo concluded that plaintiff may have trouble carrying out more detailed instructions and may have trouble maintaining concentration due to MS-related fatigue, but that she was capable of simple, one to three step tasks, given routine breaks. (Tr. at 128.) She further indicated that plaintiff "would do best w/ minimal work-related responsibilities." (Tr. at 128.) For her part, Dr. Byrd found plaintiff capable of sedentary work, with no climbing of ladders/ropes/scaffolds, occasional postural movements, frequent handling and fingering on the right, and avoiding hazards and concentrated exposure to vibration and extreme heat. (Tr. at 125-16.)

**B.	First Hearing**

Plaintiff requested a hearing, and on November 25, 2015, she appeared with counsel before an ALJ. Plaintiff testified that she was 47 years old and lived with her husband and two children. (Tr. at 849.) She indicated that she was let go from her job as a marketing manager in 2010, in part due to her health, as she had absences for doctors' appointments and had requested accommodations. (Tr. at 856-57.)

Plaintiff testified that she was diagnosed with MS in 2003, and that her condition had worsened, with the biggest symptoms being severe fatigue and cognitive problems. At that point, she could accomplish a few things over a three to four hour period before she had to lay down and take a nap or rest. (Tr. at 859, 882.) Cognitively, her organizational skills had deteriorated, and she quicky became overwhelmed. (Tr. at 860.) She would forget things, leaving doors unlocked or the car running for hours in the driveway. (Tr. at 877.) She also had trouble concentrating or understanding what people said to her if distracted by other sounds, such as the television. (Tr. at 878-79.) She further reported inability to complete tasks like paying bills if interrupted. (Tr. at 880-81.) When driving, she got lost all the time, even with

3

GPS. (Tr. at 884.)

Physically, plaintiff reported issues with her legs—weakness, numbness, tingling—which affected her ability to walk; she used a cane to help with balance. (Tr. at 860, 868.) She also experienced numbness and tingling in her lower arms and hands, particularly the right hand, which affected her ability to write and type, and caused her to drop things. (Tr. at 860-61, 874-76.) She testified that she was seeing a rheumatologist regarding a possible autoimmune disorder in that her whole body hurt all the time; they had not been able to pinpoint an official diagnosis. (Tr. at 862.)

Plaintiff further testified that she developed depression after her MS diagnosis, which also affected her ability to remember things and make decisions. (Tr. at 861, 870.) She still liked to socialize but tended to isolate herself when she was not feeling good. (Tr. at 870.)

**C.     First ALJ Decision and Judicial Review**

On February 12, 2016, the ALJ issued an unfavorable decision, finding that while plaintiff suffered from several severe physical and mental impairments, including MS, neuropathy, anxiety disorder, and affective disorder, she remained capable of a range of sedentary work involving simple, routine, and repetitive tasks, and that she would be off task about 5% of each day in addition to normal breaks. (Tr. at 74-94.) On March 30, 2017, the Appeals Council denied review (Tr. at 811), so plaintiff sought review in district court (Tr. at 818).

On January 8, 2018, I granted the parties' stipulation for remand, directing that the Appeals Council remand the matter to an ALJ to develop the record as necessary and issue a new decision evaluating plaintiff's mental residual functional capacity ("RFC") and, following the sequential evaluation process, determine whether plaintiff is disabled. (Tr. at 831.) On February 28, 2018, the Council issued a remand order. (Tr. at 837-40.) The Council

4

specifically noted that the ALJ failed to provide a narrative explanation as to why, despite her cognitive issues and fatigue, plaintiff would be off task at most 5% of each day. (Tr. at 839.)

**D.    Hearing on Remand**

On August 9, 2018, plaintiff appeared with counsel for her hearing on remand. The ALJ also summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 755.)

**1.    Plaintiff**

Plaintiff testified that her condition had worsened since the previous hearing. (Tr. at 765, 771.) She took medications which helped "mask" the fatigue and allowed her to do a few things. (Tr. at 770.) Even with the medications, she still napped during the day. (Tr. at 771.) What she did on a typical day varied based on how she was feeling. She got up in the morning and made sure the kids were getting ready for school. After they left, she usually went back to bed for about three hours because she was so tired. She was not up for the day until around 11:00 a.m. At that point, she would get up and shower, run errands, and do some laundry. (Tr. at 762.)

Plaintiff testified that she could drive within her community but for longer distances her mother or husband took her. (Tr. at 762, 774.) She rarely did household chores; her kids helped with the cleaning or they would hire a cleaning person. (Tr. at 762.) She also had a hard time with cooking due to fatigue and trouble concentrating. (Tr. at 763.) Plaintiff testified that her MS medication seemed to be staving off relapses, but she continued to experience severe fatigue and worsening cognitive issues. (Tr. at 765.)

Plaintiff further testified that she had pain in her whole body, in the shoulders, back,

5

neck, hips, and legs. (Tr. at 767-68.) She was also very stiff in the morning. (Tr. at 768.) She also testified that her right hand had continued to get progressively weaker over time. (Tr. at 772.) Plaintiff concluded that she now lacked the consistency to maintain employment because how she felt varied so greatly day-to-day. (Tr. at 769.)

### 2. VE

The VE classified plaintiff's past work as sedentary and skilled. (Tr. at 776.) The ALJ then asked a hypothetical question, assuming a person limited to sedentary work, with no climbing of ropes, ladders, or scaffolds, working with heights or hazards; no extremes of heat; frequent handling and fingering; occasional climbing of ramps and stairs; occasional stooping, kneeling, crawling, balancing, and crouching; no concentrated exposure to vibrations; and mentally limited to jobs considered simple, routine, repetitive, non-complex, with occasional changes in work routine and no fast paced production work. (Tr. at 776.) The VE testified that such a person could not do plaintiff's past work but could do other jobs, such as receptionist, credit checker, and general office clerk. (Tr. at 777.)

The VE further testified that employers would not tolerate more than 10% off-task behavior. (Tr. at 777.) Employers generally permit two 15-minute breaks and one 30-minute break in an eight hour workday, and allow absences of one to two days per month. (Tr. at 777-78.)

### E. Second ALJ Decision

On October 30, 2018, the ALJ issued an unfavorable decision. (Tr. at 725.) Following the familiar five-step process, the ALJ concluded at step one that plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of July 31, 2010,

6

through her date last insured of December 31, 2016. (Tr. at 730.)

At step two, the ALJ found that plaintiff had the severe impairments of MS, optic neuritis, history of renal cell carcinoma, degenerative disc disease, obesity, depression, and cognitive disorder. Of significance to this appeal, the ALJ acknowledged references in the record to fibromyalgia but determined that this condition was not established as a severe impairment during the period under adjudication. The ALJ stated that in January 2018 plaintiff reported a history of fibromyalgia and complained of pain in her neck, shoulders, and back, with constant achy feeling; the treatment provider diagnosed fibromyalgia but did not provider trigger point findings. In July 2018, a treatment provider noted 16 out of 18 trigger points, confirming the diagnosis. (Tr. at 731.)

At step three, the ALJ determined that none of plaintiff's impairments met or equaled a Listing. (Tr. at 732.) Regarding plaintiff's mental impairments, the ALJ found moderate limitation in understanding, remembering, or applying information; mild limitation in interacting with others; moderate limitation in concentration, persistence, and pace; and moderate limitation in adapting or managing oneself. (Tr. at 733-34.) Because the impairments did not cause two "marked" or one "extreme" limitation, they did not meet a Listing. (Tr. at 734.)

Prior to step four, the ALJ concluded that plaintiff had the RFC to perform sedentary work, except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; and occasional crouching, stooping, kneeling, crawling, and balancing. She also had to avoid extreme heat, hazards such as machinery and heights, and concentrated exposure to vibrations. Finally, she was limited to simple, routine, repetitive, non-complex work, and occasional changes in work routine, and could not engage in fast-paced production work. In making this finding, the ALJ considered plaintiff's statements regarding her symptoms and the

7

medical opinion evidence. (Tr. at 734.)

In considering plaintiff's symptoms, the ALJ acknowledged the required two-step process, under which she first had to determine whether plaintiff suffered from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited plaintiff's functioning. If the symptoms were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 735.)

The ALJ first summarized plaintiff's claims that her impairments affected her ability to engage in physical activities such as lifting, walking, and climbing, as well as her mental ability to concentrate, understand, and follow instructions. Plaintiff further alleged significant fatigue, spending about 12 hours per day in bed. (Tr at 735.)

The ALJ next summarized the medical evidence, which showed that plaintiff was diagnosed with MS in 2003. She experienced relapses in February 2010 and April 2014, after which she was treated with steroids. To her treatment providers, plaintiff reported fatigue, weakness, and a feeling of tightness in her legs. She also complained of balance issues that sometimes caused her to fall. She further reported that hotter, humid weather made her more tired. (Tr. at 736.)

The medical evidence also documented previous treatment for renal cell carcinoma and mild degenerative changes in the lumbar spine. Plaintiff's physical conditions were further compounded by obesity, in that she stood 5'1" tall and weighed 182 pounds, producing a BMI of 34.4. (Tr. at 737.)

8

As for her mental health conditions, the medical evidence showed diagnoses of depression and cognitive disorder, and treatment included medication and counseling. Plaintiff also underwent neuropsychological evaluations in 2010 and 2013, which revealed weaknesses in several areas. (Tr. at 737.)

The ALJ concluded that the medical evidence documented plaintiff's MS, optic neuritis, renal cell carcinoma, degenerative disc disease, obesity, depression, and cognitive disorder. The ALJ accounted for plaintiff's physical conditions by limiting her to sedentary work with postural limitations. To further account for her MS, the ALJ found that plaintiff must avoid extreme heat and concentrated exposure to vibrations. Due to optic neuritis of the right eye, she must avoid hazards such as machinery and heights. The ALJ accounted for plaintiff's mental conditions and related "moderate" limitations by limiting her to unskilled work that is simple, routine, repetitive, non-complex work. The ALJ further found plaintiff limited to occasional changes in work routine, and that she could not engage in fast-paced production work. (Tr. at 737.)

As for the symptoms, the ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 738.) In support, the ALJ found that (1) the medical records failed to fully substantiate plaintiff's allegations of disabling physical symptoms and limitations; (2) plaintiff engaged in activities inconsistent with her statements, including yoga classes and walking her dog; (3) while plaintiff used a cane, the medical evidence showed that her gait and station were often noted to be normal; and (4) contrary to her claims of disabling

9

mental limitations, plaintiff generally demonstrated good function on mental status exams and received conservative treatment, consisting of medication and therapy, with her symptoms improving with the medication. (Tr. at 740.)

As for the opinion evidence, the ALJ gave some weight to the opinions of the agency medical consultants, Drs. Riley and Jerda, crediting their conclusion that plaintiff could perform a range of sedentary work. (Tr. at 740.) The ALJ also gave some weight to the opinions of the agency psychologists, Drs. Gilyot-Montgomery and Donahoo, who opined that plaintiff's mental health conditions caused mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. They further opined that plaintiff retained the ability to perform one to three step tasks and would do best with minimal work-related responsibilities. The ALJ found these opinions largely consistent with the record, although she found slightly greater limitations on review of the medical evidence and plaintiff's testimony at the hearing. (Tr. at 741.)

The ALJ rejected reports from plaintiff's treating neurologist, Dr. Janel Schneider, who opined that plaintiff lacked the stamina and cognitive ability to sustain full-time work, concluding that Dr. Schneider failed to provide a rationale for, and the medical evidence did not support, those opinions. (Tr. at 741-42.) The ALJ also discounted a report from Michelle Braun, Ph.D., who performed a neuropsychological assessment in 2013 and endorsed significant limitations in plaintiff's ability to, <u>inter alia</u>, maintain attention, sustain an ordinary routine, complete a normal workday without interruptions from psychologically based symptoms, perform at a consistent pace without unreasonable breaks, respond appropriately to changes in a routine work setting, and deal with normal work stresses. The ALJ found these opinions inconsistent with the medical evidence and with Dr. Braun's own exam findings. (Tr. at 743.)

10

At step four, the ALJ determined that plaintiff could not perform her past sedentary, skilled work. (Tr. at 744.) At step five, however, she concluded that plaintiff could do other jobs, as identified by the VE, including receptionist, credit checker, and general office clerk. (Tr. at 745.) She accordingly found plaintiff not disabled during the period at issue. (Tr. at 747.)

## II.  DISCUSSION

**A.    Standard of Review**

The court "will affirm a decision on disability benefits if the ALJ applied the correct legal standards in conformity with the agency's rulings and regulations and the conclusion is supported by substantial evidence." Prater v. Saul, 947 F.3d 479, 481 (7th Cir. 2020). "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). If the ALJ's decision is supported by substantial evidence, the court must uphold that decision even if the court might have decided the case differently in the first instance. Beardsley v. Colvin, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by re-weighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. Id. at 836-37. Reversal and remand may be required, however, if the ALJ committed an error of law, or if the ALJ based the decision on serious factual mistakes or omissions. Id. at 837. The ALJ must also build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. Id.

11

## B. Plaintiff's Claims

In this court, plaintiff argues that the ALJ made various mistakes in evaluating her symptoms and the medical opinions. Some of plaintiff's claims amount to disagreement with the manner in which the ALJ weighed the evidence, which provides no basis for remand. However, plaintiff does point to two significant mistakes that will require the agency take another look at this case.

### 1. Fibromyalgia

The ALJ stated that plaintiff's fibromyalgia diagnosis was not confirmed by trigger point testing until July 2018 (Tr. at 731, 1436), but that is incorrect. The cited note, in which Dr. Mehjabein Khan, plaintiff's treating rheumatologist, recorded 16 of 18 trigger points (Tr. at 1436) and listed a diagnosis of fibromyalgia (Tr. at 1432) is dated December 5, 2016, prior to the date last insured of December 31, 2016. A fibromyalgia diagnosis can be confirmed with 11 of 18 tender points, see Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996), and Dr. Khan found 12 of 18 on June 4, 2015 (Tr. at 1468) and again on September 10, 2015 (Tr. at 1462), listing "Fibromyalgia-like features" in the latter note (Tr. at 1459).

The Commissioner responds that the error is harmless, as the ALJ fully considered plaintiff's pain complaints, regardless of the source. (Def.'s Br. at 12.) However, the ALJ discounted plaintiff's complaints of back pain as occurring after the period under adjudication and associated with fibromyalgia. (Tr. at 739, citing Tr. at 1426, 1427, 1436.) While two of the cited notes relate to a January 17, 2018 visit with Dr. Khan (Tr. at 1426-27), the third related to the December 5, 2016 appointment at which the fibromyalgia diagnosis was confirmed (Tr. at 1436.) Further, with fibromyalgia factored in, the ALJ's reliance on other medical findings

12

to discredit plaintiff's statements could be called into question. See Brown v. Berryhill, No. 2:18-CV-64-JEM, 2019 U.S. Dist. LEXIS 20423, at *10 (N.D. Ind. Feb. 7, 2019) ("The ALJ has not explained how evidence of normal range of motion, gait, motor strength, and results from neurological examinations are inconsistent with significant limitations due to fibromyalgia[.]"). Finally, the Commissioner relies on the opinions of the agency physicians, who found that plaintiff retained the ability to perform a range of sedentary work (Def.'s Br. at 13), but those doctors did not consider fibromyalgia, which was diagnosed after they issued their reports.

**2.    CPP**

The ALJ also erred in evaluating plaintiff's limitations in concentration, persistence, and pace ("CPP").[1] In a series of cases decided over the past decade, the Seventh Circuit has repeatedly held that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in CPP. See, e.g., Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019); DeCamp v. Berryhill, 916 F.3d 671, 675-76 (7th Cir. 2019); Moreno v. Berryhill, 882 F.3d 722, 730 (7th Cir. 2018), modified on reh'g, 2018 U.S. App. LEXIS 9296 (7th Cir. Apr. 13, 2018); Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015); Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014); O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010).

While the ALJ need not put the questions to the VE in specific terms, she must ensure that the VE is apprised fully of the claimant's limitations so that the VE can exclude those jobs

---

[1]The agency recently revised its regulations for the evaluation of mental impairments, and the ALJ considered the new categories here (understanding, remembering, or applying information; interacting with others; concentration, persistence, and pace; and adapting or managing oneself). (Tr. at 733-34.) I see no indication that these changes impact the Seventh Circuit's CPP case-law.

13

that the claimant would be unable to perform; the best way to do that is by including the specific limitations—like CPP—in the hypothetical. Crump, 932 F.3d at 570. Concerning the RFC finding, the court of appeals has stressed that the ALJ generally may not rely merely on catch-all terms like "simple, repetitive tasks" because there is no basis to conclude that they account for problems in CPP. Id. This is so because a person's ability to perform simple and repetitive tasks says nothing about whether she can do so on a sustained basis, including over the course of a standard eight-hour work shift. Id. Finally, the Seventh Circuit has held that when the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs. Id.

In the present case, the agency psychological consultants endorsed various moderate limitations under the rubric of concentration, persistence, and pace, as set forth above (Tr. at 110-11, 128-28), with one of the consultants further noting plaintiff "may have trouble maintaining concentration due to MS-related fatigue" (Tr. at 128). The ALJ found their opinions largely consistent with the record, stating that she found slightly greater limitations on review of the medical evidence and plaintiff's testimony at the hearing. (Tr. at 741.)

However, the ALJ's hypothetical to the VE posited a person limited to simple, routine, repetitive, non-complex work, with occasional changes in work routine, and no fast paced production work. (Tr. at 776.) And the mental RFC limited plaintiff to simple, routine, repetitive, non-complex work, occasional changes in work routine, and no fast-paced production work. (Tr. at 734; see also Tr. at 737: "The undersigned accounts for the claimant's mental conditions and related moderate 'paragraph B' limitations by limiting her to unskilled work that is simple, routine, repetitive, non-complex work.".)

The Seventh Circuit has rejected such formulations. In Varga, for instance, the

14

hypothetical assumed a person able to perform "simple, routine, or repetitive tasks in a work environment . . . free of fast paced production requirements, involving only simple work related decisions with few if any work place [sic] changes and no more than occasional interaction with coworkers or supervisors." 794 F.3d at 812. The Seventh Circuit noted that the terms "simple, routine, and repetitive" refer to the skill level of the job, i.e., how long it takes to learn how to do the work; these terms do not address whether a person with moderate difficulties in concentration, persistence, or pace can sustain such work. Id. at 815. The court further noted that a limitation on changes in work routine "deals largely with workplace adaptation, rather than concentration, pace, or persistence." Id. Finally, the court concluded that without a definition of the term "fast paced production," it would have been impossible for the VE to assess whether a person with the claimant's limitations could maintain the pace proposed. Id. at 815. The hypothetical and RFC are similarly flawed here.

In DeCamp, the agency psychological consultant, whose opinion the ALJ cited to support her findings, endorsed moderate limitations in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace. 916 F.3d at 675. Rather than including these limitations in the RFC, the ALJ instead limited the claimant to "unskilled work" with no "fast-paced production line or tandem tasks." Id. at 675. The Seventh Circuit reversed, stating: "We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on

15

concentration, persistence, and pace." Id. at 675-76 (citing Moreno, 882 F.3d at 730; O'Connor-Spinner v. Colvin, 832 F.3d 690, 698 (7th Cir. 2016)). The agency consultants found similar "moderate" limitations in plaintiff's case, and the ALJ's hypothetical and RFC failed to account for them.

In response, the Commissioner notes that the agency psychological consultants ultimately concluded that, despite some moderate limitations, plaintiff remained capable of simple, one to three step tasks given routine breaks and minimal work-related responsibilities. (Def.'s Br. at 13-14, citing Tr. at 111, 128.) The Commissioner contends that by adopting the consultants' ultimate conclusions the ALJ accounted for plaintiff's moderate limitations. (Def.'s Br. at 14, citing Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination.".)

The Seventh Circuit rejected a similar argument in DeCamp:

The Commissioner contends that the ALJ adequately accounted for DeCamp's limitations in her RFC determination and in the hypothetical question to the vocational expert by relying on part of the narrative explanations (the part of the PRT and MRFC forms where the doctors provide a written explanation of their findings, rather than the check-box sections) offered by [the agency psychological consultants]. True, both doctors offered narrative explanations in addition to the check-boxes on the assessment forms, and an ALJ may rely on those descriptions. See Varga, 794 F.3d at 816. But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms. See Yurt, 758 F.3d at 859. In Yurt, a narrative explanation translated the limitations identified by doctors in the check-box sections of the forms. See id. at 854-55. We still reversed and remanded because the ALJ did not adequately account for the limitations identified by the doctor in the check-box section of the forms. See id. at 859. Here, the ALJ similarly focused her analysis on the doctors' bottom-line conclusion that DeCamp was not precluded from working without giving the vocational expert any basis to evaluate all DeCamp's impairments, including those in concentration, persistence, and pace.

16

Id. at 676.

The Commissioner relies on Burmester, but in that case the ALJ credited the opinion of an examining consultant, rather than a reviewing consultant. In affirming the denial of benefits, the Seventh Circuit noted that the examiner's narrative report reasonably incorporated his findings regarding attention, concentration, and adaptation. See 920 F.3d at 511. The court distinguished DeCamp, where the reviewing consultants listed moderate difficulties in concentration in earlier sections of their reports, but did not include such limitations in their narrative conclusions. Id. at 511-12 (citing 916 F.3d at 675-76). This case is like DeCamp, not Burmester.[2]

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of March, 2020.

                         s/ Lynn Adelman
                         LYNN ADELMAN
                         District Judge

---

[2] The Commissioner also cites Dudley v. Berryhill, 773 Fed. Appx. 838, 842-43 (7th Cir. 2019), but that case is also factually distinguishable, as the court there noted that "Dudley's greatest limitations are stress- and panic-related" and found that the ALJ's detailed RFC adequately addressed them. Id. at 842. Plaintiff's limitations are not similarly context-specific. See also Steven T. v. Comm'r of Soc. Sec., No. 19-cv-570, 2019 U.S. Dist. LEXIS 203271, at *15 (S.D. Ill. Nov. 22, 2019) (noting that Dudley is non-precedential).

17